Submitted on record and briefs December 17, 1997; resubmitted En Banc
August 12, affirmed September 30, 1998

# ROBERT W. HANSON,
### *Petitioner,*

*v.*

# PSYCHIATRIC SECURITY REVIEW BOARD,
### *Respondent.*

### (95-1356; CA A91909)

965 P2d 1051

Harris S. Matarazzo filed the brief for petitioner.

Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Katherine H. Waldo, Assistant Attorney General, filed the brief for respondent.

RIGGS, J. pro tempore.

De Muniz, J., concurring.

Landau. J., dissenting.

**RIGGS, J. pro tempore.**

Petitioner seeks review of an order of the Psychiatric Security Review Board (PSRB or the board) denying his request for discharge from a state hospital. We affirm.

On January 19, 1995, petitioner was placed under PSRB jurisdiction for a maximum of 40 years following a trial at which he was found guilty except for insanity of the crimes of assault in the first degree and attempted murder. Those charges stemmed from an incident in September 1994. Petitioner, who by his own admission had consumed a six-pack of beer and a half pint of whiskey per day for many years preceding the incident, became convinced that he was being pursued by a gang of criminals intent on killing him. After three sleepless days during which he consumed nothing but alcohol, repeatedly called 9-1-1, and was arrested for driving under the influence of intoxicants (DUII), he entered a DMV office in Portland for the purpose of resolving the DUII charge. While in the office, petitioner believed that he heard voices plotting his murder and concluded that a bystander, Maurice Thompson, was a member of the gang that was pursuing him. He approached Thompson and, without warning or provocation, stabbed him in the torso with a pocket knife, seriously injuring him.

Petitioner was arrested at the DMV office following a brief stand-off with police. Doctors who examined petitioner after his arrest variously diagnosed him with acute psychosis, homicidal ideation, paranoid ideation, drug abuse and alcohol dependence with delirium tremens. Those diagnoses were the basis for the trial verdict of guilty except for insanity.

Petitioner initially sought discharge from PSRB jurisdiction on April 10, 1995, in a hearing pursuant to ORS 161.341(7)(a). In its order following that hearing, PSRB denied petitioner's request for discharge but found him eligible for conditional release. However, the board found further that no facility for conditional release was then available and kept petitioner in the state hospital.

On December 4, 1995, PSRB held another hearing, this time pursuant to ORS 161.341(4),[1] after petitioner again requested discharge from the state hospital. The board denied that request, repeating its earlier findings that petitioner should not be discharged, and that he was eligible for conditional release but that he could not be released because of the lack of proper facilities. The only witnesses at the hearing were petitioner and Dr. Russell, his physician at the hospital. Russell testified that, according to his diagnosis, petitioner was suffering from alcohol abuse, which is an Axis I clinical disorder under the framework in the current version of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV).[2] Russell further testified that he did not consider alcohol abuse to be a mental disease or defect.

---

[1] ORS 161.341(4) provides:

"Any person who has been committed to a state hospital designated by the Mental Health and Developmental Disability Services Division for custody, care and treatment or another person acting on the person's behalf may apply to the board for an order of discharge or conditional release upon the grounds:

"(a) That the person is no longer affected by mental disease or defect;

"(b) If so affected, that the person no longer presents a substantial danger to others; or

"(c) That the person continues to be affected by a mental disease or defect and would continue to be a danger to others without treatment, but that the person can be adequately controlled and given proper care and treatment if placed on conditional release."

An applicant for discharge or conditional release under ORS 161.341(4) bears the burden of proving fitness for discharge or release by a preponderance of the evidence. ORS 161.341(5).

[2] The DSM-IV is a reference manual published by the American Psychiatric Association. The manual categorizes mental disorders on a multiaxial system; Axis I is composed of clinical disorders, Axis II of personality disorders and mental retardation, Axis III of general medical conditions, Axis IV of psychosocial and environmental problems and Axis V of the global assessment of functioning.

The dissent takes us to task for referring to the DSM-IV, because the Supreme Court in *Mueller v. PSRB*, 325 Or 332, 937 P2d 1028 (1997), "countenanced reliance on the version on which the legislature relied only," the DSM-III. 156 Or App at 216 at n 2. However, in *Osborn v. PSRB*, 325 Or 135, 934 P2d 391 (1997), the court explained that the basis for its focus on the DSM-III was not the legislature's use of that manual in 1983, but PSRB's use of the manual when it promulgated the relevant administrative rules in 1987:

"The 'current' DSM under OAR 859-10-005(5) and (6) (1987) is the DSM-III, *because that is the edition that was in effect at the time that the PSRB adopted the rule.*" *Osborn*, 325 Or at 147 (emphasis added).

Thus, while we agree with the dissent that the Supreme Court focused on the DSM-III in cases like *Mueller* and *Osborn*, we disagree with the dissent's view of why the

In its order, PSRB found that petitioner suffered from alcohol abuse, that alcohol abuse is a mental disease or defect for purposes of ORS 161.341(4)(a), and that, without adequate supervision, petitioner would continue to present a danger to others. Petitioner challenges those findings, first on the ground that alcohol abuse is not a mental disease or defect under Oregon law and second on the ground that the board's determination was not supported by substantial evidence. We first address the contention that alcohol abuse is not a mental disease or defect.

The terms "mental disease" and "mental defect" are not defined by statute. They are defined, however, in PSRB's rules at OAR 859-010-0005:

"(4) 'Mental Disease.' Mental disease is defined as any diagnosis of mental disorder which is a significant behavioral or psychological syndrome or pattern that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSMIV) of the American Psychiatric Association.

"(5) 'Mental Defect.' Mental defect is defined as mental retardation, brain damage or other biological dysfunction that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSMIV) of the American Psychiatric Association."

The legislature, in a related statute, has created two exclusions from the definitions of mental disease and mental defect. ORS 161.295(2), which limits the verdict of "guilty except for insanity," states that

"the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."[3]

---

court did so. *Osborn* directs us to look at the version of the DSM specified in the current version of the relevant administrative rules, in this case the DSM-IV.

[3] Those exclusions are mirrored in the board's rules at OAR 859-010-0005(6)(a) and (b):

Petitioner argues that alcohol abuse falls within both of the exclusions in ORS 161.295(2). Therefore, he contends, the board erred in finding that his condition constitutes a mental disease or defect. We address first the claim that alcohol abuse is not a mental disease or defect because it is "an abnormality constituting solely a personality disorder."

Neither the legislature nor PSRB has defined the term "personality disorder." However, the Supreme Court has recently addressed its meaning. *Mueller v. PSRB*, 325 Or 332, 339, 937 P2d 1028 (1997). The court explored the scope of the legislative exclusion by referring to the current edition of the DSM, stating:

> "Because the phrase 'personality disorder' is a term of art as to which the DSM * * * was the definitive source, this court has referred to the DSM for guidance in cases involving individuals with mental diseases or defects." *Id.* at 339.

In *Mueller*, the court looked at the DSM's definition and description of organic personality syndrome in conjunction with the manual's definition of "personality disorder" and determined that the syndrome was not solely a personality disorder. *Id.* at 342. Our task is to conduct the same inquiry concerning petitioner's condition.[4]

---

"(a) The term 'mental disease or defect' does not include any abnormality manifested solely by repeated or [sic] criminal or otherwise antisocial conduct;

"(b) For offenses committed on or after January 1, 1984, the term 'mental disease or defect' does not include any abnormality constituting solely a personality disorder."

[4] We respectfully disagree with the dissent's contention that this case must be resolved by resort to legislative history. We consider ourselves bound by the four 1997 Oregon Supreme Court cases that addressed the question of whether particular diagnoses constituted mental diseases or defects under ORS 161.341(4)(a). *Mueller*, 325 Or 332 (organic personality disorder); *Menzl v. PSRB*, 325 Or 159, 934 P2d 431 (1997) (polysubstance abuse); *Rios v. PSRB*, 325 Or 151, 934 P2d 399 (1997) (pedophilia); *Osborn*, 325 Or 135 (pedophilia). In each case, the court stated that the resolution of that question depended on the description of the condition in the version of the DSM to which the PSRB rules referred. *Mueller*, 325 Or at 339; *Menzl*, 325 Or at 165; *Rios*, 325 Or at 157-58; *Osborn*, 325 Or at 143-47. Further, the court in each case resolved the issue on the first level of analysis from *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993)—text and context—without reaching the second level, legislative history. Taken together or individually, *Mueller, Menzl, Rios* and *Osborn* lay out the Supreme Court's analytical framework for addressing the question in this case. We are bound by those cases and the analytical framework they embody. Accordingly, we must respectfully decline the dissent's invitation to resolve this statutory question at the second

That inquiry leads us to conclude that alcohol abuse, like organic personality syndrome, is not solely a personality disorder. The most compelling support for that conclusion is the fact that the DSM-IV does not include alcohol abuse in its list of personality disorders. As earlier noted, *see* note 2, Axis II of the DSM-IV's multiaxial assessment framework lists and describes personality disorders. Axis II includes 11 such disorders: paranoid, schizoid, schizotypal, antisocial, borderline, histrionic, narcissistic, avoidant, dependent, obsessive-compulsive and personality disorder not otherwise specified. Alcohol abuse, on the other hand, is listed on Axis I, which describes clinical disorders. The DSM-IV states that Axis I diagnoses like alcohol abuse may accompany diagnoses of single or multiple Axis II personality disorders, but makes clear that the conditions are different in kind and must be diagnosed and recorded differently. DSM-IV at 631-32.

Further, alcohol abuse does not fit neatly within the definition and descriptions of personality disorders in the DSM-IV. In characterizing such disorders, the DSM-IV explains:

> "A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, had an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." *Id.* at 629.

Personality disorders are maladaptive and inflexible personality traits. *Id.* at 630. For example, schizoid personality disorder features "a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings," *id.* at 638, and patients who exhibit histrionic personality disorder are diagnosed based upon their "pervasive and excessive emotionality and attention-seeking behavior." *Id.* at 655.

Alcohol abuse, on the other hand, is not defined in terms of personality traits, as such. Rather, it is a subset of the disorder known as substance abuse, which is a "maladaptive pattern of substance use manifested by recurrent and

---

level of *PGE* analysis, when the Supreme Court has four times resolved it at the first level.

significant adverse consequences related to the repeated use of substances." *Id.* at 182. The defining feature of alcohol abuse is the maladaptive use of alcohol. That behavior is not a "personality trait" in the sense that, for example, emotionality or detachment are. The fact that alcohol abuse is defined and described in terms significantly different from those used to describe personality disorders suggests strongly that it is not such a disorder under the DSM-IV. *See Mueller*, 325 Or at 342 (definition, characteristics of organic personality syndrome distinguish it from list of personality disorders). Because the DSM-IV informs our interpretation of the statutory text at issue, *id.* at 339, we conclude that alcohol abuse is not "solely a personality disorder" within the meaning of ORS 161.295(2) and OAR 859-010-0005(6)(b).

We also reject petitioner's contention that alcohol abuse is not a "mental disease or defect" because it fits within the statutory exclusion for abnormalities "manifested only by repeated criminal or otherwise antisocial conduct." ORS 161.295(2); OAR 859-010-0005(6)(a). A plain reading of that exclusion demonstrates that it should not apply to petitioner's condition. Alcohol abuse is diagnosed on the basis of a patient's maladaptive use of alcohol. DSM-IV at 182. While such excessive drinking by an adult is clearly unhealthy, it is neither *per se* criminal nor invariably antisocial.

Even were we to conclude that maladaptive alcohol consumption is inherently criminal or antisocial to some degree, petitioner's condition still would not fit within the exclusion. The exclusion is applicable only if a particular abnormality is "evidenced *solely* by repeated criminal or otherwise antisocial conduct." *Osborn v. PSRB*, 325 Or 135, 148, 934 P2d 391 (1997) (emphasis in original). *Osborn* involved a diagnosis of pedophilia. The court, while noting that pedophilia was both criminal and antisocial, emphasized that the disorder also has attributes of fantasy and "sexual arousal that is not a normal part of sexual activity." *Id.* at 149. Accordingly, because pedophilia *"has mental and psychological features"* according to the DSM, the court found that it did not fit within the exclusion. *Id.* at 149-50 (emphasis in original).

The same is true of petitioner's condition. While alcohol abuse certainly may be accompanied by antisocial and unlawful conduct, it, like pedophilia, also has mental and psychological features. For example, one feature of the disorder is that individuals "may continue to consume alcohol despite the knowledge that continued consumption poses significant social or interpersonal problems for them * * *." DSM-IV at 196. That feature is certainly present in petitioner's case; he testified that he repeatedly has tried to stop drinking and that his drinking had caused the deterioration of his marriage and other aspects of his life. Continuation of a behavior in the face of knowledge of the harmful effects of that behavior is at least partly a mental or psychological difficulty. Because that difficulty is an aspect of petitioner's condition, his condition is not "manifested only by repeated criminal or otherwise antisocial conduct" and is not excluded from the definition of "mental disease or defect" on that basis.

In sum, we conclude that alcohol abuse does not fall within either of the statutory exclusions in ORS 161.295(2). The board did not err in finding that alcohol abuse is a "mental disease or defect."

■ Petitioner also asserts that PSRB erred because its decision, that petitioner suffers from a mental disease or defect, is not supported by substantial evidence. The basis of that argument is Dr. Russell's testimony that, in his opinion, alcohol abuse is not a mental disease or defect. Because no witness testified to the contrary, petitioner argues, the board's rejection of that opinion was without evidentiary support.

Petitioner's argument is not well taken. The board's central factual conclusion, that petitioner suffers from alcohol abuse, clearly was supported by substantial evidence in the form of Dr. Russell's uncontradicted testimony and several exhibits. *See, e.g., Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990) ("substantial evidence supports a finding when the record, viewed as a whole, permits a reasonable person to make the finding"). It is such factual conclusions that we review for substantial evidence. ORS 183.482(8)(c). Statutory interpretations, on the other hand, are legal conclusions. As such, they are reviewed for errors of

law. ORS 183.482(8)(a). PSRB is entitled to disregard witnesses' interpretations of statutory terms and rely on the DSM-IV, its own expertise or any other source in deciding whether a particular condition is a mental disease or defect, so long as its conclusion is consistent with the legislature's intent and its own rules.

Affirmed.

**DE MUNIZ, J.,** concurring.

■ The majority holds that "alcohol abuse" is a mental disease for purposes of PSRB jurisdiction and that there is substantial evidence that petitioner suffers from alcohol abuse. The dissent concludes to the contrary on the basis of persuasive legislative history that the legislature did not intend the definition of mental disease in ORS 161.295 and the PSRB statutes to include alcohol abuse.[1] Although I agree with the dissent's conclusion as to the legislature's intent, I write separately because I would not permit petitioner to argue at the PSRB hearing that his alcohol abuse is not a mental disease.

In *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609-10, 892 P2d 683 (1995), the Supreme Court described the concept of "judicial estoppel" as a common-law equitable principle designed " 'to protect the judiciary, as an institution, from the perversion of judicial machinery.' " *Id.* at 609 (quoting *Edwards v. Aetna Life Ins. Co.,* 690 F2d 595, 599 (6th Cir 1982)). The court indicated that the doctrine may be invoked to "preclude a party from assuming a position in a judicial proceeding that is inconsistent with the position that the same party has successfully asserted in a different judicial proceeding." *Id.* Although the state has not sought to rely on judicial estoppel to preclude petitioner's argument here, I believe it is incumbent on this court to give notice that petitioner's blatant attempt at manipulation of the judicial process violates the principle of judicial estoppel.

---

[1] Although not mentioned by either the majority or the dissent, it is interesting to note that ORS 161.125(1) provides, in part, that voluntary intoxication is not a defense to a criminal charge. In light of that statute, it is difficult to understand how alcohol-induced delusions could legitimately constitute a mental disease defense.

Petitioner is an alcoholic. While at a DMV office in Portland, petitioner stabbed a bystander with a pocket knife inflicting serious injuries. Petitioner told the police and various medical doctors and treatment providers that he stabbed the victim because he believed the victim was member of a gang that was plotting his murder and had pursued him to the DMV office. At trial on the charges of attempted murder and assault in the first degree, petitioner sought to avoid criminal responsibility for his act by claiming that at the time he stabbed the victim he was suffering from alcohol-induced delusions that constituted a mental disease or defect under ORS 161.295.[2] The trial court accepted petitioner's mental disease defense, entered a judgment of guilty except for insanity, and placed petitioner under the jurisdiction of the PSRB for a period of 40 years. However, less than a year after the judgment was entered petitioner sought his discharge from PSRB jurisdiction.

At the hearing before the PSRB, petitioner claimed that his alcohol abuse is not a mental disease but a personality disorder or an abnormality manifested only by repeated criminal or otherwise antisocial conduct, and, therefore, excluded from the definition of mental disease under ORS 161.295[3]—the very statute petitioner relied on initially to avoid responsibility for his criminal act nine months earlier. Petitioner, thus, originally claimed that his alcohol abuse was a mental disease and used it as a shield to avoid criminal responsibility. Now, in order to gain his freedom, he takes the exact opposite approach, arguing that his alcohol abuse is not a mental disease. As noted above, judicial estoppel is intended to preclude a party from assuming a position in one judicial proceeding that is inconsistent with the position the same party successfully asserted in a different judicial proceeding. I would hold, on the basis of judicial estoppel, that

---

[2] From the record, it is unclear whether petitioner's delusions were the result of severe alcohol intoxication or the withdrawal from alcohol. In either event, it is fair to say that petitioner's delusions about the innocent stranger he stabbed were alcohol induced.

[3] ORS 161.295(2) provides, in relevant part, that the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder.

petitioner's reliance at trial on the defense that his alcohol-induced delusions constituted a mental disease under ORS 161.295 precludes him from now arguing that his alcohol abuse is not a mental disease under ORS 161.295.

Petitioner's only challenge to the evidence is that there is no evidence of a mental disease.[4] As to that argument, there is substantial evidence to support the PSRB's finding of alcohol abuse. Consequently, I would affirm the PSRB's order.

Armstrong and Wollheim, JJ., join in this concurrence.

**LANDAU, J.,** dissenting.

The majority holds that, as used in ORS 161.341(4), the term "mental disease or defect" includes the diagnosis "alcohol abuse," even though it is clear beyond debate that the Legislative Assembly that enacted the statute and its related provisions intended quite the contrary. The majority justifies its conclusion by resorting to the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed 1994) (DSM-IV), which defines alcohol abuse as a mental disorder. Thus, the majority ignores what the legislature actually intended in favor of a professional reference work that was not published until more than a decade after the statute was enacted into law. Such reasoning cannot be squared with any reasonable notion of legislative intent generally nor with the analytical framework for ascertaining legislative intent described in *PGE v. Bureau of Labor and Industries,* 317 Or 606, 610-12, 859 P2d 1143 (1993), particularly.

To ascertain the intended meaning of the term "mental disease or defect," we are required to examine the text of the statute in its context. *Id.* at 610-11. If analysis of the text in context does not clearly reveal the intended meaning of the term—that is, if it remains reasonably susceptible of more than one meaning—then we must examine the legislative history and other interpretive aids. *Id.* at 611-12.

---

[4] I note that petitioner does not contend that he no longer presents a substantial danger to others. ORS 161.346(1)(a).

ORS 161.341(4) does not define the term "mental disease or defect." Its meaning certainly is not intuitively obvious. *See Webster's Third New Int'l Dictionary,* 1168, 1411 (unabridged ed 1976) (using "mental disorder," "mental disease" and "insanity" as interchangeable terms). From the term alone, it is impossible to determine whether the legislature intended alcohol abuse to be considered a "mental disease or defect" within the meaning of the statute.

The context of the statute includes other related statutes. *Jones v. General Motors Corp.,* 325 Or 404, 411, 939 P2d 608 (1997). ORS 161.295, relating to criminal responsibility, is such a statute. It defines the term "mental disease or defect" specifically to exclude "any abnormality constituting solely a personality disorder." ORS 161.295(2). Unfortunately, the statute does not define "personality disorder." In particular, it sheds no light on whether the legislature intended alcohol abuse to be considered a "personality disorder" and thus not a "mental disease or defect" within the meaning of the statute.

Prior judicial construction of the relevant statutes also must be considered at the first level of analysis. *Michels v. Hodges,* 326 Or 538, 544, 956 P2d 184 (1998). Especially pertinent in that regard is the Supreme Court's decision in *Mueller v. PSRB,* 325 Or 332, 937 P2d 1028 (1997). In that case, the court addressed whether the diagnosis "organic personality disorder" constitutes a "mental disease or defect" within the meaning of ORS 161.341(4)(a) and ORS 161.295(1). The court began by assuming that the legislature intended that the version of the DSM in effect at the time of the enactment of the statute may be referred to "for guidance in cases involving individuals with mental diseases or defects." *Mueller,* 325 Or at 339. Apparently, the court examined the legislative history; I know of no other way that the court could have arrived at that conclusion.[1] The court then

---

[1] Consistent with that inference, the court cited in support of its conclusion *State v. Huntley,* 302 Or 418, 431-36, 730 P2d 1234 (1986), in which the court more explicitly relied on the legislative history in explaining the relationship of the DSM to the various determinations that are required under ORS chapter 161. *Mueller,* 325 Or at 339.

Thus—and contrary to the majority's reading of the decision—the court's opinion in *Mueller* did not rest on the text alone. The court did not examine the

disposed of the case on the basis of the definitions in the DSM-III, which was the version in existence at the time the legislature enacted ORS 161.295(1). *Id.* at 342-43.

I do not read *Mueller* to hold broadly that, regardless of what the legislature actually may have intended, what constitutes a "mental disease or defect" within the meaning of the statute always is determined by reference to the DSM in effect at the time of enactment and that recourse to the legislative history is inappropriate. The court did not say that. The court said that the DSM may be referred to for "guidance." Moreover, it is apparent that the court itself looked to the legislative history in *Mueller*.

Therefore, because it remains unclear whether the legislature intended alcohol abuse to be considered a "personality disorder" within the meaning of ORS 161.295(1), it is necessary to examine the legislative history. That history shows that the legislature considered the very question at hand and enacted the bill that became ORS 161.295(1) with the stated intention that the term "personality disorder" include alcohol abuse, that is, that alcohol abuse not be considered a "mental disease or defect."

ORS 161.295 originated as House Bill 2075 (HB 2075) in the 1983 Legislature. An interim legislative committee drafted the bill to address public concern over the scope of the so-called "insanity defense" in criminal cases. In its original version, the bill did not exclude "personality disorders" from the term "mental disease or defect." At an introductory hearing on the bill, Felicia Gniewosz, the Executive Director of the Psychiatric Security Review Board (Board) submitted written testimony stating the Board's support for the bill and its suggestions for strengthening it. She specifically suggested:

> "The legislature should take a position to either include or exclude 'personality disorders' from the definition [of mental disease or defect]. It should be noted that personality disorders include the following diagnoses: antisocial, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent and paranoid."

---

legislative history, it is true. But that is because it already had done so, explicitly and extensively, in prior cases.

Testimony, House Committee on Judiciary, HB 2075, April 27, 1983, Ex D at 2.

During the same hearing, Judy Snyder, the Chair of the Board, similarly testified that the Board supported the exclusion of personality disorders from the definition of "mental disease or defect" and that the term personality disorder includes child molestation and other sex offenses, as well as persons "suffering from a drug-induced syndrome." Testimony, House Committee on Judiciary, HB 2075, April 27, 1983, Tape 270, Side A at 108. Board chair Snyder added as an example of a personality disorder,

"people who have an alcohol problem and who maybe stabbed someone while they were in an alcoholic stupor and they're put under our jurisdiction. * * * The problem the Board has is that kind of a person can be very dangerous if they drink alcohol but the doctors will testify that's not a mental illness, they don't have a mental illness[.]"

*Id.* at Tape 269, Side B at 112.

At a later hearing on the bill, the subject of excluding personality disorders from the definition of "mental disease or defect" again arose. Following a discussion of the difficulties of defining terms, Representative Hill questioned whether the distinguishing characteristic of a personality disorder is the individual's self control. The Executive Director of the Board replied that some individuals can control their disorders, while others cannot. She explained that "the perfect example would be that one of the personality disorders would be somebody that's alcohol or drug dependent." Testimony, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A at 200. At that point, Representative Courtney, a member of the legislative interim task force that drafted the bill, asked Jeffrey Rogers, the chair of the task force, what language could accomplish the proposed exclusion of personality disorder. Rogers proposed what is in substance the current law. The amendment was adopted without objection. Testimony, House Committee on Judiciary, HB 2075, May 13, 1983, Tape 324, Side A at 302.

The committee ultimately approved the bill with the exclusion amendment. In the staff measure analysis, legal

counsel for the committee summarized the effect of the bill in the following terms:

> "The bill as amended further limits the scope of mental diseases or defects for which a person may be found, under present law, 'not responsible.' Existing law excludes abnormalities manifested only by repeated criminal or otherwise antisocial conduct. The bill would exclude, in addition, any abnormality which constitutes solely a personality disorder, which includes such diagnoses as sexual conduct disorders, drug dependent and alcohol dependent."

Staff Measure Analysis, House Committee on Judiciary, HB 2075, 1983.

In the floor debates in the House, the floor manager, Representative Courtney, explained that the bill contained a "personality exclusion," which accomplished a narrowing of the definition of mental disease or defect. Quoting directly from the letter from Gniewosz to the House Judiciary Committee, Courtney explained:

> "Right now if a person has what is considered a personality disorder, by that I mean what they call 'anti-social, inadequate, passive-aggressive, sexual conduct disorders, drug dependent, alcohol dependent, or paranoid,' if they fit into that personality disorder category they're able to claim that they have a mental disease or defect. We now no longer, with this piece of legislation, will allow an individual to say that I have a mental disease or defect because I have a personality disorder."

House Floor Debate, HB 2075, June 16, 1983, Reel 19, Track I at 218.

The bill then was referred to the Senate Judiciary Committee. Representative Courtney introduced the bill to the committee, explaining that it "would remove personality disorders as a category that could be relied upon for use of the insanity plea." Testimony, Senate Committee on Judiciary, HB 2075, June 29, 1983, Tape 234, Side A at 067. He described people with personality disorders as "anti-social, inadequate, passive, aggressive, sexual conduct disorders, drug dependent, alcohol dependent, paranoid, etc." *Id.* At the same hearing, task force chair Rogers testified. He explained

to the committee the findings of a study that he and two professors from the Oregon Health Sciences University recently had completed concerning the insanity defense in Oregon over a five-year period. That report explicitly categorized alcohol and drug dependency as personality disorders. Senate Judiciary Committee, HB 2075, June 29, 1983, Unmarked Exhibit ("Oregon's New Insanity Defense System: A Review of the First Five Years—1978-1982") at 14.

The Senate committee amended the bill to delete the exclusion of personality disorders, apparently because of concern that the term was too difficult to define. The Senate approved the bill as amended.

The deletion of the exclusion was the first topic of debate in the Conference Committee. Representative Courtney explained that he was satisfied by testimony from the Board and from Rogers that the term "personality disorder" has a meaning in the profession. In his explanation, Courtney explicitly referred to the Rogers report and its list of diagnoses—including drug and alcohol dependency—that qualified as personality disorders. Tape Recording, Conference Committee, HB 2075, July 13, 1983, Tape 550, Side A at 002. The Conference Committee ultimately agreed to restore the personality disorder exclusion. The staff measure analysis, prepared by House Committee Counsel, explained that, as amended, the bill "would exclude * * * any abnormality which constitutes solely a personality disorder, which includes such diagnoses as sexual conduct disorders, drug dependent and alcohol dependent." Staff Measure Analysis, House Committee, HB 2075, 1983. The bill as amended by the Conference Committee was approved by both houses and was signed into law.

Legislative history frequently can be sparse, equivocal and sketchy. *See Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995) (Graber, J., dissenting) (reliance on statements of two witnesses and two legislators "fraught with the potential for misconstruction"). That is not the case here. Indeed, the Supreme Court has relied on much less. *See, e.g., Zidell Marine Corp. v. West Painting, Inc.*, 322 Or 347, 357-59, 906 P2d 809 (1995) (relying on statement of single witness). In this case, the precise

issue arose in both houses and was the subject of testimony by experts, agency officials and legislators. Throughout the enactment process those individuals consistently referred to drug and alcohol dependency as examples of the personality disorders that are excluded from the statutory term "mental disease or defect." The examples were repeated in floor debates in the House by the manager of the bill. And the examples were further repeated in the staff measure analysis of the Conference Committee.

In short, there can be no question that the legislature intended alcohol dependency to be a "personality disorder" within the meaning of ORS 161.295(1) and thus not a "mental disease or defect" within the meaning of ORS 161.295(1) or ORS 161.341(4)(a).

The majority does not apply the interpretive analysis required by *PGE* in assigning a meaning to the terms "personality disorder" and "mental disease or defect." Instead, the majority reasons that, although the terms are not defined by statute, they are defined by administrative rule, and the administrative rule expressly incorporates the provisions of the DSM-IV. That approach, however, is inconsistent with *PGE* and with basic principles of administrative law.

Administrative agencies may not, by rule, "amend, alter, enlarge or limit the terms of a statute." *Cook v. Workers' Compensation Department*, 306 Or 134, 138, 758 P2d 854 (1988). Agency rules always are subordinate to judicial ascertainment of the intended meaning of statutory terms, at least unless the rules define terms that "express non-completed legislation which the agency is given delegated authority to complete." *Springfield Education Assn. v. School Dist.*, 290 Or 217, 228, 621 P2d 547 (1980). No party to this case has suggested that the statutory terms at issue in this case are delegative. And, in any event, the legislative history clearly demonstrates that the legislature's intentions were to the contrary: The legislature had a specific list of diagnoses in mind when it enacted what is now ORS 161.295(1). Thus, the administrative rule, promulgated long after enactment, does not establish what the legislature intended the statute to mean.

The majority refers to the Supreme Court's decision in *Mueller* for support. In *Mueller*, however, the court addressed a different issue and said only that the version of the DSM in effect at the time of enactment may be referred to for "guidance," because it was apparent that the legislature generally relied on that reference work with respect to the terms at issue. The court did not address the issue raised in this case—namely, that the legislature did not in fact rely on the then-current version of the DSM with respect to the proper classification of alcohol dependency—and the court did not preclude examination of the statute and its enactment history to resolve that issue.[2]

In this case, the Board accepted expert testimony that petitioner suffers from alcohol dependency. The Board concluded that the diagnosis constitutes a mental disease or defect, not a personality disorder, because the diagnosis is so categorized in the DSM-IV. In my view, the Board erred. The legislature intended that alcohol dependency be regarded as a personality disorder, not a mental disease or defect. Therefore, I would reverse the Board's order and remand for reconsideration. From the majority's decision to the contrary, I respectfully dissent.

Warren, J., joins in this dissent.

---

[2] Even assuming, for the sake of argument, that the majority correctly reads *Mueller*, its reliance on the DSM-IV is inappropriate, because the DSM-IV was not published until long after the relevant statutes were enacted. The court countenanced reliance only on the version on which the legislature relied. *Mueller*, 325 Or at 339.